I am representing the petitioners here, including the growers who depend upon the pesticide clopyrifos as a vital crop protection tool. The petitioners in this case do not dispute that the FFDCA requires an aggregate exposure analysis to determine whether a tolerance for a pesticide residue is safe. The dispute, the issue in this case, Your Honors, is what exposures must EPA aggregate together in doing that risk assessment. The statute answers the question in subsection B2A2, which provides the definition of safe for this analysis. There it says safe means no harm from aggregate exposure, including all anticipated dietary exposures and other exposures for which there is reliable information. The key word there is anticipated. Now, to be sure, the statute also addresses the topic of existing tolerances. Existing tolerances are set forth in subsection B2D as one of a non-exclusive set of factors that the agency must consider in making it safety finding. But that is the starting point. That is not the ending point. The ending point is in the definition of safety in subsection B2A, which I just read. And that is no risk of harm from the aggregation of anticipated exposures. Consistent with the forward-looking nature of that direction, anticipated, EPA's settled practice is to do a forward-looking risk assessment. How will uses change? How will the risks change as uses change? What mitigation is required to bring risk down to an acceptable level? That is the approach it takes as it adds tolerances, as it removes tolerances, as it makes the safety finding for doing so. And that is the announcement of a safety finding in December 2020 with the PID. The agency had undertaken years of scientific analysis and risk assessment, which it finalized and produced earlier that year in 2020. And it looked at two different sets of clopirofos uses. Set number one, everything. Set number two, the subset of 11 uses that we are discussing in this case today. It had two different findings about the risk from those two different analyses. For everything it concluded, the risks here, considering all exposures, were too high to comply with the FQPA's most stringent safety standard. But it also said that considering this subset of 11 safe uses, that there is no risk of aggregate harm of exposure to anyone using the most protective safety standard set forth in the statute. Counsel, what's the effect of the Ninth Circuit's decision in, I assume, a response of the EPA to that decision and its effect on what's before us? That Ninth Circuit case, Your Honor, which I'll refer to as LULAC. LULAC 2, I think it's officially called. Correct. Supports the petitioners and shows why EPA was wrong here. In that case, the issue that the Ninth Circuit focused on was the fact that under the older analysis, the 2016 analysis, they had not identified that subset of safe uses yet. The risk analysis, the safety finding, for what was cited in the 2016 risk assessments, considered only all uses and said there are too much risk considering all uses. And what EPA's position was then was that it could modify, that is, reduce the number of tolerances at issue and make a safety finding on the narrowed subset. And that was what the Ninth Circuit said the problem was. Can I ask you this? After the PID comes out and identifies safe uses, as you termed it, did any of the manufacturers cancel all their other registrations? Yes. As of today, all of the other manufacturers have taken the step of voluntarily canceling their registrations for food use, with one exception, and that is GARDA, one of the petitioners today. It maintained the registrations for the 11 safe uses, canceling the rest of the food uses. But the point is, throughout that period of time, when a tolerance is revoked as a matter of law, it cannot be used in the field on that crop. So it has not been used throughout this course of litigation since the tolerances went into effect. Well, correct me if I'm wrong, but my understanding is after the PID came out and identified some safe uses, there was a period of negotiation back and forth to try to get cancellations of the non-safe uses, and that that just didn't materialize. And the EPA was up against a deadline set by the Ninth Circuit, and I may have this wrong, but essentially it appears they had no choice but to go ahead and cancel completely. That is not correct under the facts or the law, Your Honor, and I'll explain why. So after the PID came out defining the 11 uses and giving it safety finding, EPA did use that in its negotiations with the registrants, including GARDA, on what would be given up. What's important there for this Court to understand is that it used the PID definition as a baseline and took the position in writing in the spring of 2021 that nothing but the safe uses would be allowed. Clearly, at that point in time, EPA was not anticipating that all the existing uses would continue. Now, as a matter of law, EPA does not need the cooperation of any registrant in order to make a tolerance decision. It can make the tolerance decision on its own, on the basis of the information that it has, and it can eliminate the tolerances that correspond to those in the PID that are outside of the safe use zone. It does not need any cooperation from GARDA or any other registrant to do that. But, in fact, what they did get, and it's in the record, is the written commitment from GARDA to revoke, change its registrations, to comply with the agreed upon list of safe uses. They had that commitment in writing. What did they do? They just went silent over the last few weeks of the deadline period and walked away. There was nothing that forced this decision out of EPA. They had the information, that is the scientific safety finding. They had the definition of safe uses. They had the application rates that would be corresponding to the safe uses. They had everything they needed in order to make the safety finding and to require the registrations to be amended accordingly. And remember, the Ninth Circuit, to Chief Judge Levinsky's point, didn't set a deadline for that paperwork to be done, that is the changing of the labels. It set a deadline to make a decision. It didn't set a deadline for the tolerances to expire. It didn't set a deadline for the registrations to change. The tolerances were kept in place for a period of 10 months after the decision came out of the Ninth Circuit and LULAC II. They had the information. They had the time. They had the authority to make the decision. And remember what they said in trying to justify the rule in the denial order, addendum page 49. There they said how negotiations take place between EPA and registrants is not at all relevant to the validity of the final rule. What matters is whether there is evidence to align with the safety finding that was made by the agency. Here the evidence is for these uses that it is safe, compliant with the FQPA safety standard, protects infants, children, and everyone. And EPA has no... But didn't they, counsel, didn't they say that these studies and these so-called safe uses were tentative? And say, you know, ultimately, the way I read it is the 60-day and 90-day deadlines didn't allow them to make conclusive findings based on the studies that they had written or that they had reviewed. And so isn't that, isn't really the problem potentially that the Ninth Circuit deadline made it so they couldn't reach that final conclusion? Whether that's arbitrary or not, I don't know, but I wanted to address that point. The answer to your question is no, Your Honor. The statement made in the PID was that EPA had determined that these uses were safe. That's point number one. Point number two, all of that, including the science, went through notice and comment that was completed in March of 2021 before the LULAC 2 case ever came down. Point number three is that even after considering all of that in the issue in the final rule, the EPA in August 2021 did not back away from its scientific conclusions at all. It still said that these safe uses are safe. In answering the objections in February of 2022, it said the same thing. It still stands behind the science today in this court. On pages 12 and 13 of their brief, they still say, considering all of that, after all of this time, uses consistent with the PID are indeed safe, consistent with the statute. Let me ask it this way. Let's say we were to deny the petition and the final rule stands. Couldn't you then, you, meaning the manufacturers, cancel registrations and then file an administrative petition to reinstate tolerances for the safe uses? The problem with that, Your Honor, is that for the registrants, the manufacturers, it takes years, hundreds of thousands of dollars to do. But more critically, for the other petitioners here, the growers, that gives them no relief in the interim. And the pest pressure grows every year that the pests are untreated. Those losses will continue to my clients. They will get worse over time. I think the North Dakota brief makes this point very well, as well as the declarations. So that is not an appropriate path. The other problem, Your Honor, is that, as we noted in our latest 28-J that we filed yesterday, the EPA is now trying to use the same argument and the revocation of tolerances in going after the last remaining registrants, Clopyrifos registration. That very last bit which is left. One registrant, one company, 11 uses. They're using these same arguments that they've advanced in the final rule and in this court today to try to cancel the registration. So that, Your Honor, would provide no relief. What we would request, Your Honor, is that the court would vacate EPA's revocation of the tolerances for the safe uses and remand it back to EPA with instructions in order to enter the safety finding for the safe uses that it had announced in the PID. And consistent with the LULAC II order from the Ninth Circuit, EPA should be ordered to conform the remaining Clopyrifos registrations, which are the only ones that are held by GARDA, to conform to the safe uses. EPA should be ordered to do that immediately and under Section D4A1 without any further notice and comment, which is also the direction given in the LULAC order. Your Honor, I'll reserve the rest of my time unless there are questions for rebuttal. I don't see any. Thank you, Mr. Long. Ms. Glickman. Good morning, and may it please the Court. My name is Laura Glickman, and I'm appearing on behalf of EPA. With me at counsel's table is Angela Husky, also of EPA. Counsel, before you get started in your prepared remarks, just listening to the final statement and conclusion of the appellant, what's the EPA's response to their request for relief to have this Court to direct the EPA to find that the 11 potentially safe uses to conform the requirements on the manufacturers to 11 uses that have been found to be safe? I think there are a few issues with their request for relief, and I'll address that question first. EPA has not made a final safety finding with regard to the 11 uses proposed in the PID. It was a proposed document under a different statute, which is FIFRA, which allows EPA to put that document out for notice and comment. Depending on who you ask, the proposed uses are either over-inclusive or under-inclusive. EPA received comments from environmental groups who argued that the science didn't support retaining any uses at all. Those comments addressed the scientific underpinnings of the PID. In order to make a final safety finding, EPA would have to grapple with those comments and address them. Asking the Court to direct EPA to just go ahead and make a safety finding short-circuits that process. The other issue with vacating with regard to the 11 uses is that the assumptions in the PID reflect changes to FIFRA registrations and labels under FIFRA. In particular, EPA still doesn't have in hand labels that would effectuate the changes as they were proposed in the PID. So there wouldn't be... Could I follow up? A lot of what I read between the lines, and you can correct me if I'm wrong, seems to be the 9th Circuit made me do it. And I don't think the government's really saying that. But the fact of the matter is, you came up here and asked the sort of question I asked the opposing counsel, which is, it seems like the 9th Circuit, by putting these 60-day deadlines, by pushing, at one point even telling the EPA that it had to cancel these tolerances, which was reversed or vacated by the Enfront Court, it feels like the normal process got short-circuited. And so why shouldn't we vacate and remand so the EPA can finish its process correctly under the amount of time it needs to deal with all of these safety questions? I think the question for the Court is whether EPA's decision was reasonable at the time it was made. I think it is true that normally, as EPA has expressed as far back as its carbofuran decision, their practice is to try to negotiate changes with registrants. And I think the record here shows that EPA really bent over backwards to try to maintain some uses. But without any sort of review and the deadline approaching, it didn't have a choice, really, but to revoke these tolerances. And remember, after receiving any firm commitments from registrants, it still would have had, at the end of that process, to go back and make a safety decision. Was the decision to revoke the tolerances based on scientific conclusions or research of some kind? Yes. So EPA looked at all of the studies and concluded that aggregate exposure to all chlorpyrifos exposures that it believed were anticipated was unsafe, including in particular for infants and children. Now, the USDA also has some regulatory responsibility in the area of food. How does their research compare to that that is conducted and has been conducted by the EPA? EPA was the agency that was tasked with making this decision. USDA does disagree with the decision. However, they did not file any objections to the final rule. My understanding is that they don't have the same expertise with regard to... They do have expertise in food safety. They do have expertise in safety, but Congress tasked EPA with making these decisions. I'm not disputing that USDA has expertise with regard to food safety and with regard to pesticides in particular, but this decision was EPA's. The USDA didn't join the process until quite recently. Council, I want to go back to my question, which is, were the deadlines too short for EPA? I mean, was it possible to complete everything you wanted to complete in the short deadlines given by the Ninth Circuit? I think EPA thought that it perhaps would be possible. I don't think they would have known for sure until it actually occurred. Their hope was that GARDA and other registrants would take the actions that EPA had requested quickly and then it could move on to assess the safety. The reason why I ask that is because the DC Circuit in particular... I know the issue before essentially is whether what EPA did was arbitrary in the process, but the DC Circuit actually has another remedy that they apply in circumstances like these, at least from my understanding, and that's a straight up remand. Sort of saying, take another look at this. We're not saying that what you did is arbitrary and capricious, but take another look at this and figure out if you need more time or if there's more information you need, take another look at it. Why shouldn't we order that in this case? We would, given the choice between vacater and remand without vacater, we would prefer remand without vacater. EPA still again would have to make the safety finding and it would still need to be able to look at anticipated uses and have a commitment or labels in hand under FFRA that would effectuate those changes. Right now, sitting here today, we don't have a safety finding. We also don't have the labels in hand or a commitment to submit them. I asked Mr. Long about, during the negotiation process, whether the manufacturers had canceled the non-safe use registrations. It seemed to me, I'm not sure I totally understood it, but it sounded like he said yes, that they had agreed to cancel or had canceled them. Is that accurate or not? No, Your Honor, that's not accurate. At the time, EPA... And or did I misunderstand him? Maybe I misunderstood what he was saying. Either way, I'll explain from our perspective. At the time of the final rule, EPA had not received any cancellation requests or label amendments from any registrant. EPA, after publishing the final rule and denying the objections, said that if it doesn't receive voluntary cancellation requests for non-food uses, that it will commence involuntary cancellation proceedings. At this point, every registrant, except for GARDA, has asked EPA to cancel all of the non-food uses. EPA has acted on some of these cancellation requests, but is still processing others. I see. That occurred after the final rule. Yes, Your Honor. Petitioner's argument that EPA had an obligation to reduce anticipated exposures so that it could modify the tolerances instead of revoking them is unsupported by either the text of the FFDCA or FFRA. As we've discussed, what is safe under the FFDCA is based in part on anticipated exposures and other words anticipated uses. With regard to modification, the FFDCA does not provide EPA with a basis to unilaterally choose one tolerance over another where aggregate exposure is unsafe. Nor does EPA have the authority under FFRA, which is a licensing statute, to quickly cancel registrations or amend labels without registrant's consent. Petitioner's claim to the contrary in their reply brief misreads EPA's regulations and the statutes. There simply is no magic wand here. And that is why EPA attempted to negotiate with GARDA and other registrants to reduce the number of uses. But without a commitment as to what uses would be narrowed, EPA reasonably conducted a safety assessment based on what the uses were at the time. The FFDCA does not ask EPA to determine whether there might be some action it could take under FFRA that would enable it to make a safety finding under the FFDCA. Instead, it requires EPA to assess anticipated exposures in making that tolerance or combination of tolerances that could potentially meet the safety standard. But that doesn't render its decision here unreasonable. And I think that's particularly true because both the Ninth Circuit and the FFDCA say that when aggregate exposure is unsafe, EPA must either revoke or modify the tolerances. It doesn't say that if EPA can only revoke if it finds that it can't modify them. There's discretion that's built into the statute. And so even if it were true that EPA could have perhaps modified the tolerances, it doesn't render the decision to revoke unreasonable. Well, does the record show how you take into account the consequences of making the choice to go to complete elimination as opposed to studying for more tolerant uses? Just to make sure I understand, are you referring to consequences to farmers? To all who have interests. Sure. So there's a high bar in the statute for retaining uses in response to a petition to revoke, which is what we had here. So EPA had to make an affirmative safety determination. It couldn't consider under the statute any economic impacts to growers. That can only be considered under FFDCA. The sole question here is one of safety. And the Ninth Circuit was clear that if EPA chose to modify the tolerances within the 60 days, that it would have to make a safety finding at the same time. And that's the only way that EPA could have retained those uses. And a safety finding here, again, is not guaranteed. EPA still, again, is looking at the science. And I think, you know, we've talked a lot about the Ninth Circuit's Law 2 decision. The Ninth Circuit did not mince words here that EPA had abdicated its statutory duty under the FFDCA by trying to find excuse me, the Ninth Circuit found that EPA had abdicated statutory duty by what it was doing in terms of delaying making any sort of safety determination. And that this delay had exposed a generation of American children to unsafe levels of chlorpyrifos. And it said to EPA, your time is now up. Here's 60 days. And I think EPA acted reasonably, given the facts before it. And in particular, the Ninth Circuit's deadline. If there are no further questions, I'll move on to discuss the PID or the PID. The uses that were proposed in the PID did not constitute a final safety finding. I think the PID itself made clear that it wasn't a final safety determination. It said that the list of uses may be considered for retention. What could be reasonably relied upon based on the PID? Are they entitled to any kind of reliance on that document and what it represents? I don't believe so. And this is an argument that petitioners make, I think, in their opening brief. The PID was a proposed decision. And then even if somebody had relied on it, the Ninth Circuit made clear that it was not a final safety determination. Instead, it said that EPA would have to make one if it chose to modify the tolerances. Therefore, I don't think any sort of reliance on the PID would have been reasonable. I see my time has expired. If there are no further questions, for those reasons, I think that the Court should find for EPA on the merits. Thank you. Mr. Long, your rebuttal. Your Honors, I'd like to start with the PID, where we just ended. It was certainly more than just a proposal. It was an announcement of the results of safety analyses that had been completed earlier in 2020. And it used very specific language, saying, we, EPA, have determined that the safe uses will not pose potential risks. That finding then went through notice and comment, which was completed before LULAC. And even after that, in the August 2021 rule, EPA said that the safe uses were indeed safe. This suggestion that my colleague has made, that there's some doubt about the science here, is just not true. You can read that on page 42 of Petitioner's Addendum, which is the statement EPA made in the final rule, or the objections to the final rule, saying, there is no factual dispute here. EPA does not dispute its scientific conclusions and findings in the PID. They said, this is a legal dispute about what we can consider. And on that issue, they've just abandoned their position. They've always had the position that we can consider proposals and make safety findings on proposals. In the 2021 decision, they abandoned their position. EPA's abandonment of their position is arbitrary and capricious. And for that reason alone, this Court should reverse and remain. Thank you, Mr. Long. Thank you also, Ms. Glickman. We appreciate both cases submitted. Counsel may be excused.